**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**RONALD LEE MANNON,**

      **Plaintiff,**

**v.**                           **Case No.: 3:12-cv-07725**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' motions for judgment on the pleadings. (ECF Nos. 11, 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 7, 8). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court **FINDS** that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.    Procedural History

Plaintiff, Ronald Lee Mannon ("Claimant"), filed for DIB and SSI on March 30, 2011, alleging a disability onset date of November 10, 2010, (Tr. at 181, 185), due to

"bipolar disorder, obsessive compulsive disorder, anxiety, agoraphobia, explosive personality disorder, COPD [chronic obstructive pulmonary disease], paranoia, ADHD [attention deficit hyperactivity disorder], chronic back ache." (Tr. at 207). The Social Security Administration ("SSA") denied the application initially and upon reconsideration. (Tr. at 33). Consequently, Claimant filed a request for a hearing, which was held on April 3, 2012 before the Honorable Andrew J. Chwalibog, Administrative Law Judge ("ALJ"). (Tr. at 48-65). By decision dated May 18, 2012, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 33-42). Claimant requested a review of the ALJ's decision and submitted additional evidence, which was incorporated into the record and considered by the Appeals Council. (Tr. at 1-6). The ALJ's decision became the final decision of the Commissioner on October 4, 2012, when the Appeals Council denied Claimant's request for review. (*Id.*).

On November 13, 2012, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Proceedings on January 22, 2013. (ECF Nos. 9, 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 11, 12, 13). Accordingly, this matter is ripe for resolution.

## II.   <u>**Claimant's Background**</u>

Claimant was 48 years old at the time of his alleged disability onset. (Tr. at 181). He had completed the tenth grade and subsequently obtained a GED. (Tr. at 53). Claimant's past relevant work experience included staining and painting furniture and managing a business that installed mufflers. (Tr. at 268).

III.   **Relevant Medical Evidence**

The Court has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence. Because Claimant's challenges to the Commissioner's decision are based largely on his pulmonary and psychiatric conditions, the Court limits its summary of Claimant's medical treatment and evaluations to those conditions.

A.   **Chronic Obstructive Pulmonary Disease**

The first medical evidence of record documenting a pulmonary issue is an Emergency Department ("ED") coversheet dated October 25, 2008, which lists dyspnea and respiratory abnormality as the primary diagnoses. (Tr. at 630). Notably, Claimant left the ED on that occasion without being seen. The next record is dated nearly two years later and reflects that on June 2, 2010, Claimant underwent a chest x-ray as part of an ED evaluation. The x-ray was interpreted as showing Claimant's heart and lungs to be within normal limits. (Tr. at 322).

On January 28, 2011, Claimant presented to the Carl Johnson Medical Center to establish primary care. (Tr. at 348). He complained of experiencing shortness of breath on exertion, chest pressure, and a cough. He reported using Albuterol in the past with some symptomatic relief. Claimant was diagnosed with mild COPD and given prescription medications and an inhaler. (*Id.*). One month later at a follow-up appointment, Claimant reported that he continued to have shortness of breath. (Tr. at 347). He indicated that he intended to quit smoking. (*Id.*).

Claimant underwent pulmonary function studies on June 9, 2011, which revealed severe COPD with mild pulmonary restrictive disease. (Tr. at 483). Improvement was noted with bronchodilation. There was no evidence of bronchospasm or acute respiratory illness. (Tr. at 485). On June 16, 2011, Claimant advised his primary care physician that he

3

continued to smoke approximately two packs of cigarettes per day despite his efforts to stop. He reported trying electronic cigarettes and nicotine patches without success and requested a prescription for Chantix. (Tr. at 544-45). Claimant denied shortness of breath, and his lungs were noted to be clear to auscultation bilaterally with good air flow. (*Id.*). Claimant was given a prescription for Chantix and was instructed to continue using Advair and Proventil for his COPD.

Approximately one month later, Claimant returned for a follow-up visit. (Tr. at 543). He indicated that he had reduced his cigarette usage from two packs per day to one pack per day. His lungs were clear to auscultation bilaterally. He was told to continue taking Chantix and to further reduce his cigarette smoking. (*Id.*). His pulmonary condition was essentially the same at his next visit in September 2011. (Tr. at 541).

On March 7, 2012, Claimant underwent a four corner fusion, scaphoid excision, radial styloidectomy, removal of bone spurs, transposition of the extensor pollicis longus, resection of the posterior interosseous nerve, and a carpal tunnel release of the right wrist for symptoms of pain and arthritis. (Tr. at 570-72). The surgical procedure was performed under general anesthesia and went well, but soon after extubation, Claimant developed hypoxia. (Tr. at 774-78). Claimant was evaluated by a pulmonologist and found to be in no acute distress with non-labored respirations, equal breath sounds, and symmetrical chest wall expansion. However, he did have some bilateral basilar fine crackles. Claimant denied apnea, shortness of breath, changes in his chronic cough, sputum production, coughing up blood, wheezing or cyanosis, but reported that he could only walk ½ block before experiencing shortness of breath. He was diagnosed with COPD, questionable pulmonary edema, and probable sleep apnea. He was given a one-time dose of Lasix, told to continue

Advair, Spiriva, and Albuterol, as needed. (Tr. at 774). Claimant was also told that he would need "long term" oxygen on an outpatient basis. (*Id.*).

### B. Psychological Disorders

In late October 2009, Claimant sought medical attention at St. Mary's Medical Center's ED for depression and thoughts of suicide. (Tr. at 648-60). The triggering event was a recent divorce, although Claimant admitted to a history of depression. Claimant's blood alcohol level was 171, and he refused admission, but requested medication to "calm him down." (Tr. at 658). Claimant was diagnosed with major depression and referred to Prestera Centers for Mental Health ("Prestera"). (Tr. at 649-50).

Claimant presented to Prestera on October 28, 2009 for intake and to establish care. (Tr. at 360-75). Claimant advised the intake clinician that he had never received psychiatric hospitalization, crisis support, or substance abuse treatment in the past. He described current feelings of depression and anxiety, which began after his wife of 26 years divorced him. He complained of having difficulty adjusting to living alone and having relationship problems with his new girlfriend. Claimant reported problems with irritability, agitation, crying spells, difficulty sleeping, and diminished appetite. He admitted to drinking four to five beers per day. Claimant stated that he was employed as a painter but was having financial difficulties that required him to file bankruptcy papers. The clinician felt that Claimant needed to be evaluated by a psychiatrist, placed on psychotropic medications, and scheduled for individual therapy with a psychologist. A few days later, Claimant went to the ED with a blood alcohol level of 364. (Tr. at 329). He left against medical advice, but returned in two days complaining of depression. (Tr. at 668). He was given Prozac and instructed to follow-up with Prestera. (Tr. at 672).

Claimant returned to Prestera on November 16, 2009. (Tr. at 358-59). He reported feeling much better than he did on intake. He had been on Prozac for two weeks and was seeing his ex-wife some, which made him very happy. He admitted to abusing alcohol for a long time, drinking as much as a 12 pack of beer each day. After a long discussion, Claimant and his therapist agreed that he did not need to return for therapy, but would continue taking his psychotropic medications. (*Id.*).

Claimant did not seek psychiatric treatment again until May 17, 2010. (Tr. at 376-87). At that time, Claimant was experiencing serious relationship issues with his live-in girlfriend and her adult son. He reported feeling isolated, agitated, and paranoid and advised that he had stopped taking his psychotropic medications. Claimant admitted to lashing out at his girlfriend and her son and also admitted that his mood was beginning to affect his work. He indicated that he was seeking help so that his girlfriend would not end the relationship. Claimant's functional assessment revealed mild dysfunction in self-care; mild dysfunction in activities of community living; moderate dysfunction in the social interpersonal and family domain; moderate dysfunction in concentration and task performance; and mild dysfunction on the domain of maladaptive, dangerous, and impulsive behaviors. He was diagnosed with a mood disorder, not otherwise specified, and obsessive compulsive disorder. His Global Assessment of Functioning ("GAF") score was a 55.[1] He was scheduled for a psychiatric evaluation, but refused therapy due to his work schedule.

---

[1] The GAF scale is a tool for rating a person's overall psychological functioning on a scale of 0-100. This tool was regularly used by mental health professionals and was recognized by the American Psychiatric Association in its *Diagnostic and Statistical Manual of Mental Disorders (DSM) IV-Text Revision.* However, in the latest edition of the DSM (DSM-5), the GAF scale was abandoned as a measurement tool. On the GAF scale, a higher score indicates a less severe impairment. A score of 51-60, for example, indicates moderate symptoms OR moderate difficulty in social, occupational, or school functioning.

Claimant was evaluated by a Prestera psychiatrist on June 2, 2010 and diagnosed with bipolar disorder, mixed, and alcohol abuse. (Tr. at 398-99).  His GAF score was 45,[2] and his prognosis was fair to poor. The treatment plan included mood stabilization and counseling. (*Id.*). The following day, Claimant took an overdose of aspirin after arguing with his girlfriend. (Tr. at 318-20). He was brought to the ED by his sister and was treated with activated charcoal. Claimant reported that he had been given prescriptions for Seroquel and Depakote at Prestera, but had been unable to afford the medications and had not filled the prescriptions. Claimant was subsequently placed on emergent dialysis because his condition continued to deteriorate. (Tr. at 316). Once his condition stabilized, Claimant was discharged to Prestera's crisis unit where he remained for six days. (Tr. at 400-401). When released from the crisis unit, Claimant's condition had substantially improved.

Claimant returned to Prestera on June 15, July 16 and 29, August 11, 18, and 26, September 21, October 25, and November 16, 2010; once or twice per month in 2011; and approximately six times in 2012 before the ALJ issued his written opinion. (Tr. at 388-459, 499-533, 576-611). During that time period, Claimant did not require any additional hospital care for acute exacerbations of his psychological disorders, nor was he admitted to Prestera's crisis unit. Nonetheless, the clinical records indicate that Claimant continued to experience depression, agitation, mood swings, isolation, and irritability, although he conceded some benefit from regular therapy and medication. On November 16, 2010, Claimant reported to his therapist that he had gotten drunk, was arrested for domestic violence and spent two weeks in jail. As a result, he had lost his job. (Tr. at 442). For that

---

[2] A GAF of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).

reason, Claimant's therapy was transferred to Prestera's substance abuse facility so that he could focus on sobriety. By March 2011, Claimant was maintaining his sobriety and reported that he was doing better overall with managing his moods. (Tr. at 515). However, a month later, Claimant complained of depression, anxiety, and of hearing voices. (Tr. at 512-13). His disagreements with his girlfriend and her son continued, causing an increase in his paranoia, isolation, and anxiety. (Tr. at 504, 508-09, 525, 526, 544, 588-89, 590-91).

On February 2, 2012, Claimant continued to be depressed, but reported that behavioral interventions, such as walking, helped to improve his mood. (Tr. at 597). Two days later, Claimant met with the Prestera psychiatrist for medication management. (Tr. at 580-81). Claimant indicated that he was doing "okay" and was not having major problems with his mood swings, irritability, or depression. Four days later, at a counseling session, Claimant identified his biggest problem to be his relationship with his girlfriend. (Tr. at 596). According to Claimant, his girlfriend limited his independence, preventing him from going places and talking on the telephone, because she did not trust him. As a result, he spent most of the day inside watching movies.

In March 2012, Claimant had one encounter for psychiatric treatment; he saw his psychiatrist on March 3, 2012 for medication management. (Tr. at 598-601). His Zyprexa was decreased due to side effects of dizziness and twitching, and his Depakote was increased with no side effects. (Tr. at 598). Claimant's mental status examination was normal and his GAF score was 55, indicating a significant improvement with ongoing treatment.  (Tr. at 599-600).  One month later, Claimant was again evaluated by his psychiatrist, who noted that he continued to be symptomatic, particularly since discontinuation of his antipsychotic medication. (Tr. at 604). His GAF score had decreased to 50, indicating that his symptoms were now borderline severe.

8

The record reflects that after the ALJ's decision denying benefits, Claimant had five more sessions at Prestera. (Tr. at 737-39, 745-48). On May 25, 2012, Claimant met with his therapist and reported increased depression and irritability. (Tr. at 737). He stated that the SSA had again denied him benefits, his mother was now in a dementia ward in a nursing home, and he continued to have problems with his girlfriend, all of which were stressors. *Id.* On June 11, 2012, Claimant reiterated an increase in his symptoms, and his therapist noted that Claimant was having difficulty breathing, was trembling, and had pressured speech. (Tr. at 738). He indicated that he was taking his medication, but it was not relieving his symptoms. The following day, Claimant met with his psychiatrist for medication management. (Tr. at 745-48). He was accompanied by his girlfriend and reported "doing better." (*Id.*). His mental status examination was largely normal, although he displayed a deficit in coping skills, some isolation, and a restricted affect. His GAF score was stable at 50. No changes were made to his medication. (*Id.*).

On June 27, 2012, Claimant reported to his therapist that his anxiety was increasing to the point that he rarely left the house. (Tr. at 739). The therapist observed that Claimant had shaking legs and feet, trembling lips, and a tight posture. At his following visit on July 16, 2012, the therapist noted that Claimant continued to display tremors and tight posture. (Tr. at 740). He described his mood as anxious, nervous, and aggravated and conceded that his increase in anxiety might be related to his disability claim. That same day, Claimant's therapist wrote a letter superficially reviewing Claimant's symptoms during the seven-month period since the therapist had started counseling Claimant. (Tr. at 768). She indicated that Claimant "had evidenced symptoms of higher anxiety at the last several visits with pressured speech, trembling, and difficulty breathing." (*Id.*). She added that Claimant was having trouble following through with basic therapy techniques and was not

reporting much relief with his medications.

## IV.   **Summary of ALJ's Findings**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the ALJ assesses whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past

relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner at the final step of the process. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, when taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" when assessing disability. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not

severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of the resulting functional limitation against the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual mental function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirement of the Social Security Act through December 31, 2015. (Tr. at 35, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry in the process because he had not engaged in substantial gainful activity since November 10, 2010, the alleged date of disability onset. (Tr. at 35, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of COPD, depression, personality disorder, and substance abuse. Additional impairments of back and wrist problems were evaluated as non-severe. (Tr. at 35-36, Finding No. 3). At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or medically equal any of the impairments contained in the Listing. (Tr. at 36-38, Finding No. 4). Accordingly, the ALJ determined that:

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasionally climbing ramps/stairs, balancing, stooping, kneeling, or crouching; never climbing ladders/ropes/scaffolds or crawling; avoid concentrated exposure to extreme heat/cold; and avoid even moderate exposure to fumes, odors, dust, gases, poor ventilation and hazards (machinery, heights, etc.) (Exhibit 9F). Mentally, he can perform routine work-related activities that do not require

> intense concentration; he would do best in a setting that kept change to a
> minimum, working with things rather than people; and social interaction
> should be kept at the occasional and superficial level (Exhibit 7F).

(Tr. at 38-40, Finding No. 5). The ALJ concluded that Claimant could not perform past

relevant work, so he reviewed Claimant's work experience, age, and education in

combination with his RFC to determine if Claimant would be able to engage in substantial

gainful activity. (Tr. at 40-42, Finding Nos. 6-10). The ALJ noted that (1) Claimant was

born in 1962 and, at the time of the hearing, was defined as an individual closely

approaching advanced age; (2) he had a high school equivalent education and could

communicate in English; and (3) transferability of job skills was not material to the

disability determination. (Tr. at 41, Finding Nos. 7-9). Considering these factors,

Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that

Claimant was able to perform various occupations at the light and sedentary exertional

levels that existed in significant numbers in the national and regional economy. (Tr. at 41-

42, Finding No. 10). At the light level, Claimant could work as a house sitter, hand

packager, and package tagger; at the sedentary level, Claimant could perform the activities

of a bench worker, inspector, and grader/sorter. (Tr. at 41-42). Thus, the ALJ concluded

that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 42,

Finding No. 11).

## V.    <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant raises three challenges to the Commissioner's decision. First, he contends

that the ALJ improperly assessed and discounted his credibility. (ECF No. 11 at 5-7).

Second, Claimant asserts that the Appeals Council failed to adequately consider "new,

material, and additional evidence" that supports a reversal or remand of the ALJ's

decision. (*Id.* at 7-9). Specifically, Claimant submitted additional medical records, to the

Appeals Council including records from Prestera, St. Mary's Medical Center, and University Orthopaedics. (Tr. at 612-784). Although some of these records were duplicative, new records included documentation of six visits at Prestera in 2012, a letter from Claimant's therapist, and assorted notes detailing Claimant's wrist surgery and follow-up visits. (Tr. at 736-48, 768, 774-84). Also contained in the records concerning Claimant's wrist surgery was a consulting pulmonologist's statement that Claimant required long term oxygen use. (Tr. at 774).

Third, Claimant points to a March 31, 2013 disability determination award issued by the SSA on applications filed by Claimant after the applications in dispute in this action, emphasizing that the SSA approved disability benefits for the period beginning one day after the ALJ's decision. Claimant argues that "[c]ases within this District have consistently held that a disability determination that commences the day after an administrative law judge's opinion that a plaintiff is not disabled constitutes new and material evidence necessitating remand." (ECF No. 13 at 1).

In response, the Commissioner asserts that the ALJ properly assessed Claimant's credibility and explained in detail his reasons for discounting Claimant's statements of symptom persistence and severity. (ECF No. 12 at 15-16). The Commissioner further contends that the new records supplied by Claimant do not warrant a remand for two reasons. (*Id.* at 17-19). First, the records from Prestera do not relate to the period at issue in the case, which ended with the ALJ's May 18, 2012 decision. According to the Commissioner, the records document a decline in Claimant's psychological condition that occurred after the decision was issued. Second, the records documenting Claimant's need for oxygen do not satisfy the twelve-month jurisdictional requirement, as they establish that Claimant did not require outpatient oxygen until after his surgery in March 2012. (*Id.*)

## VI.   <u>Analysis</u>

### A.   <u>Sentence Four and Sentence Six of 42 U.S.C. § 405(g)</u>

As previously stated, Claimant seeks a remand or reversal of the Commissioner's decision on three grounds. First, he argues that remand is appropriate because the ALJ failed to fully credit Claimant's statements relating to the persistence and severity of his symptoms. Second, he claims that remand or reversal is necessitated by the "new, material, and additional" medical evidence that was supplied to, but overlooked by, the Appeals Council. Finally, he contends that the award of benefits subsequently granted by the SSA, which took effect one day after the ALJ's denial of benefits, on its own, constitutes new, material, and additional evidence that requires remand. Before considering the merits of Claimant's arguments, it is necessary to review the statutory basis for remand or reversal of the Commissioner's decision.

The Court may remand the Commissioner's decision for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand, or a reversal of the Commissioner's decision, is appropriate when the Commissioner's decision is not supported by substantial evidence, the Commissioner incorrectly applied the law when reaching the decision, or the basis of the Commissioner's decision is indiscernible. *Brown v. Astrue,* Case No. 8:11–03151–RBH–JDA, 2013 WL 625599 (D.S.C. Jan. 31, 2013) (citations omitted). Under sentence four, the Court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If new and material evidence is submitted after the ALJ's decision and while a request for review is pending, the Appeals Council:

shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R 404.970(b). Thus, when the Appeals Council incorporates new and material evidence into the administrative record, and nevertheless denies review of the ALJ's findings and conclusions, the issue before the Court is whether the Commissioner's decision is supported by substantial evidence in light of "the record as a whole including any new evidence that the Appeals Council specifically incorporated into the administrative record." *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011) (remanding for rehearing pursuant to sentence four of 42 U.S.C. § 405(g)) (quoting *Wilkins v. Secretary, Dept. of Health and Human Services*, 953 F.2d 93, 96 (4th Cir. 1991) (internal marks omitted)). If the ALJ's decision is flawed for any of the reasons stated, the Court may reverse and/or remand the matter for a rehearing under sentence four. Here, the record before the Appeals Council included the medical information supplied after the ALJ's decision. Accordingly, Claimant's first two grounds for remand or reversal must be assessed under sentence four standards.

In contrast, sentence six applies to a remand based on new and material evidence supplied to the court, which was not submitted to the ALJ or the Appeals Council and was not considered in reaching the Commissioner's final disability decision. *See Snider v. Colvin,* 6:12-cv-00954, 2013 WL 4880158 (S.D.W.Va. September 12, 2013) (discussing the difference between a sentence four and a sentence six remand); *Cameron v. Astrue,* No. 7:10-CV-00058, 2011 WL 2945817, at *7 (W.D.Va. July 21, 2011) ("Sentence six applies specifically to evidence not incorporated into the record by either the ALJ or the Appeals

16

Council."). In a sentence six remand,

> the district court does not affirm, modify, or reverse the Secretary's decision; it does not rule in any way as to the correctness of the administrative determination. Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding.

*Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157,115 L.Ed.2d 78 (1991). Under sentence six, remand to the Commissioner on the basis of newly discovered evidence is appropriate if four prerequisites are met:

> (1) the evidence must be relevant to the determination of disability at the time the application(s) was first filed; (2) the evidence must be material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there must be good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant must make at least a general showing of the nature of the new evidence to the reviewing court.

*Miller v. Barnhart*, 64 Fed.Appx. 858, 859-60 (4th Cir. 2003); *see also* 42 U.S.C. § 405(g); *Borders v. Heckler,* 777 F.2d 954, 955 (4th Cir. 1985). In this case, the award of benefits recently obtained and submitted by Claimant to the Court was not considered by the ALJ or the Appeals Council. Therefore, an assessment of whether it constitutes new and material evidence justifying remand must be reached using sentence six standards.

### B.      Assessment of Claimant's Credibility

Claimant contends that the ALJ improperly discounted his credibility. (ECF No. 11 at 5-7). He argues that the ALJ failed to apply the correct legal standard for assessing credibility and provided only "boilerplate" reasons for disbelieving Claimant's statements regarding the severity and functional limitations of his impairments. In contrast, the Commissioner argues that the ALJ fully considered all of the evidence before reaching a conclusion regarding Claimant's credibility and explained in detail the reasons underlying

his finding that Claimant was less than fully credible. Having carefully reviewed the ALJ's credibility assessment in light of all of the evidence, including the supplemental medical information supplied by Claimant, the Court finds that the ALJ applied the law properly and made a credibility finding that is supported by substantial evidence.

Under Social Security regulations, an ALJ must evaluate the credibility of a claimant's statements regarding the severity, persistence, and intensity of his symptoms using a two-step process. 20 C.F.R. § 404.1529; *see also Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms. *Id.* § 404.1529(a). A claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186. In evaluating a claimant's credibility regarding his or

her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources. 20 C.F.R. § 404.1529(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques. *Id.* § 404.1529(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 404.1529(c)(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at *4-5.

> In *Hines v. Barnhart*, the Fourth Circuit Court of Appeals stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (4th Cir. 2006) (citing *Craig*, 76 F.3d at 595). Thus, the ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, a lack of supportive medical evidence, or the presence of contradictory medical evidence, may be factors considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in

the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at 7. However, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.*

Here, the ALJ provided a detailed overview of Claimant's testimony, which he then compared against the relevant evidence and consultative evaluations in order to assess Claimant's credibility. (Tr. at 38-40). The ALJ found that Claimant's impairments could reasonably be expected to cause the symptoms he alleged, but concluded that Claimant's statements concerning the intensity, persistence and limiting effects of those symptoms were not fully credible. (Tr. at 39-40). The ALJ noted that Claimant testified that he could not work due to anxiety and panic attacks, yet his mental health and primary care records did not document the claimed attacks. Claimant testified that he spent 90% of his time in his bedroom and did not perform household chores, but clinical notes reflected that he took walks nearly every day, attended therapy sessions, and was described by his therapist and psychiatrist as cooperative, calm, pleasant, and well-groomed. (*Id.*). The ALJ also pointed out that Claimant completed Adult Function Reports in which he acknowledged attending to his personal needs without difficulty; dusting and vacuuming his apartment; driving; going to the grocery store twice each month; making simple meals; paying bills; attending doctors' appointments; and talking on the telephone. Additionally, the ALJ was

20

bothered by Claimant's testimony that his COPD required him to use oxygen "24/7" when the medical records did not substantiate such a serious impairment. (*Id.*).

Claimant strongly disagrees with the ALJ's conclusion that Claimant was not completely reliable. He argues that the ALJ made assumptions that were blatantly incorrect and contrary to the evidence. According to Claimant, the ALJ's mishandling of the credibility analysis was especially troubling given the vocational expert's testimony that if Claimant was adjudged fully credible, the functional limitations associated with his impairments would preclude him from engaging in substantial gainful activity. Claimant contends that the clinical records clearly support his allegations of disability, as did his physical appearance at the administrative hearing, which he attended with a portable oxygen tank and nasal cannula in tow. Moreover, Claimant argues that the additional records supplied by Claimant after the hearing document his anxiety and corroborate his need for long-term auxiliary oxygen.

Because the ALJ relied heavily on the notes from Prestera and the lack of objective evidence establishing severe COPD, the Court closely examined the available information pertinent to these impairments. The clinical records from Prestera confirm that Claimant suffered from a mood disorder, anxiety, paranoia, and a substance abuse disorder for more than a year before the alleged onset of disability and well over two years before the ALJ's decision. Nevertheless, the ALJ's determination that Claimant was not disabled as of May 18, 2012 is not inconsistent with those records. In late October 2009, approximately one year before the alleged onset of disability, Claimant was hospitalized for depression and suicidal thoughts, which were reportedly triggered by a recent divorce. (Tr. at 334-37, 645-660). At that time, Claimant was drinking heavily and was not receiving any psychiatric care. Claimant was treated acutely at the hospital and referred for regular outpatient

therapy. Seven months later, Claimant was hospitalized a second time for an aspirin overdose and a blood alcohol level of 244. (Tr. at 299-301). He was discharged to a Crisis Unit where he began psychotropic medications and therapy. At discharge, Claimant had improved significantly. The remaining notes, which document Claimant's psychological state prior to the alleged disability onset, reflect periods of improvement intermingled with episodes of symptom intensification. However, despite his psychological illness, Claimant continued to work. In November 2010, Claimant's work situation changed drastically, but not because he was experiencing debilitating panic attacks and anxiety. Instead, Claimant lost his job after being jailed for two weeks on a domestic violence charge. (Tr. at 442).

The notes prepared at Prestera after November 10, 2010 identify several important considerations. First, Claimant stopped abusing alcohol and had symptom improvement with regular medication usage. (Tr. at 447, 515, 517, 580, 582, 583, 590, 594, 598). Second, Claimant's psychological turmoil primarily stemmed from his profoundly dysfunctional relationship with his girlfriend and his continued conflict with her adult son; not anxiety and panic attacks. (Tr. at 443, 512, 520, 521, 522, 523, 524, 525, 526, 527, 583, 588, 594, 595, 596, 597). Third, Claimant's isolation was in large part due to his girlfriend's insistence that he not be independent. (Tr. at 589, 590, 594, 596). Notably, most reports of increased symptoms came from Claimant's girlfriend, rather than from Claimant. (Tr. at 508-09, 512, 526, 582, 594, 602). Objectively, Claimant was frequently noted to be stable, calm, cooperative, euthymic, pleasant, well-groomed, and desirous of increasing his activity level and independence. (Tr. at 509, 515, 517, 580, 582, 588, 591, 596, 597, 598-99, 736). None of the records placed restrictions on Claimant's activities or suggested that he was psychologically incapable of performing work-related functions. When considering these notes as a whole, substantial evidence supports the ALJ's skepticism of Claimant's

testimony that anxiety and panic attacks prevented him from working.

Similarly, Claimant criticizes the ALJ for discounting his claim that he required continuous oxygen. Claimant states, "It is difficult to understand why the Administrative Law Judge closed his eyes to the Plaintiff's breathing condition when Plaintiff appeared at the hearing carrying a portable oxygen tank with a breathing cannula." (ECF No. 11 at 6). The ALJ explained in his written decision that he saw no objective evidence in the record suggesting that Claimant's COPD was severe enough to require continuous oxygen, and Claimant continued to smoke against medical advice, an action that was incongruous with a severe pulmonary condition. (Tr. at 40). Substantial evidence supports the ALJ's findings. While it is true that Claimant subsequently produced a medical record dated March 7, 2012 in which a consulting pulmonologist opined that Claimant would need "long term O2 2l/min," this recommendation was made shortly after Claimant experienced an unexpected, isolated, and acute perioperative hypoxia, with evidence of pulmonary edema. (Tr. at 774). The remaining medical records simply do not reflect symptoms of this severity.

Records prepared prior to Claimant's March 2012 wrist surgery establish that Claimant had severe COPD with mild pulmonary restrictive disease that improved with bronchodilation. (Tr. at 483). Even so, Claimant was not prescribed oxygen, nor was he instructed to limit his activities. Instead, he was prescribed medication and an inhaler, and was encouraged to reduce his two pack per day smoking habit. (Tr. at 544-45). Physical examinations of his lungs were largely unremarkable, revealing few complaints or serious signs and symptoms of pulmonary insufficiency. (Tr. at 348, 541, 543, 545, 563, 698-99). No record exists during this time frame indicating that Claimant requested oxygen support or needed it.

During the March 2012 wrist surgery, Claimant experienced an isolated episode of hypoxia that prompted a pulmonology consultation. A chest x-ray showed atelectasis that was not present on a prior film, as well as mild edema. (Tr. at 774-78). Claimant advised the pulmonologist that he had a history of COPD, but was not on oxygen. He admitted to a 40-year history of smoking and complained of having shortness of breath when he walked more than half a block. Other than evidence of apnea and some basilar crackles, Claimant's pulmonology examination was essentially normal. (*Id*.). The consultant recommended long-term oxygen use, but gave no indication as to the precise length of time Claimant would require outpatient oxygen, how oxygen use would impact Claimant's daily routine, and whether he needed to limit or restrict his activities.

Records prepared after Claimant's wrist surgery contain no notations describing Claimant with a portable oxygen tank or using any form of auxiliary oxygen. (Tr. at 720). In fact, an ED record dated June 1, 2012, approximately three months after Claimant's wrist surgery, reflects that Claimant had no complaints of difficulty breathing. His pulmonary examination revealed normal breath sounds, no respiratory distress, and no chest tenderness. (Tr. at 721). Claimant was not described as using supplemental oxygen, and his oxygen saturation on "room air" was 95%. (*Id*.). Similarly, documentation from a follow-up appointment with Claimant's wrist surgeon on June 20, 2012 contains no mention that Claimant was on oxygen or was having any breathing difficulties. The last medical record submitted by Claimant to the Appeals Council reflects an ED visit in August 2012. (Tr. at 760-61). Once again, Claimant was not observed with a portable oxygen tank or using auxiliary oxygen. He made no complaints regarding his pulmonary system, and no abnormalities were found on physical examination. According to the record, Claimant continued to smoke one pack of cigarettes each day. (*Id*.).

24

Thus, while the pulmonology opinion recommending long-term oxygen use may negate the ALJ's implication that Claimant's oxygen tank was a prop rather than a necessary medical device, the records prepared before and after Claimant's perioperative hypoxic event simply do not substantiate Claimant's allegation that he needed and used continuous oxygen supplementation. Therefore, the ALJ's discounting of Claimant's testimony regarding the functional limitations associated with his COPD remains a valid finding supported by substantial evidence. Indeed, if Claimant was truly dependent on continuous oxygen by nasal cannula, that fact would be apparent in the medical records, either as an observation, by reported history, on physical examination, or as part of a treatment plan. Moreover, if Claimant's ability to breathe was so severely restricted that he became hypoxic in the absence of continuous auxiliary oxygen, it is implausible that he would be physically able to smoke a pack of cigarettes each day.

The additional errors Claimant assigns to the ALJ's credibility determination are likewise meritless. First, Claimant argues that under the "mutually supportive test" recognized in *Coffman v. Bowen*, 829 F.2d 514 (4th Cir. 1987), he satisfies the requirements of 42 U.S.C. § 423(d)(5)(A) because his testimony is supported by objective medical source findings. (ECF No. 11 at 7). Claimant misinterprets the holding in *Coffman*. There, the issue was not whether the ALJ erred in assessing the claimant's credibility, but whether the ALJ applied the appropriate legal standard in weighing the treating physician's opinion that the claimant was disabled from gainful employment. *Coffman*, 829 F.2d at 517-18. The United States Court of Appeal for the Fourth Circuit found that the ALJ had misapplied the relevant standard by discounting the physician's opinion due to the alleged lack of corroborating evidence, when the correct standard was to give the opinion great weight *unless* persuasive contradictory evidence was present in the record.

*Id.* at 518. The Fourth Circuit then pointed out that evidence supporting the physician's opinion, in fact, existed in the record, noting "[b]ecause Coffman's complaints and his attending physician's findings were mutually supportive, they would satisfy even the more exacting standards of ... 42 U.S.C. § 423(d)(5)(A)." *Id. Coffman* offers no applicable "test" for assessing a claimant's credibility and, consequently, is inapposite. As the written decision plainly reflects, the ALJ applied the correct two-step process in determining Claimant's credibility.

Second, Claimant argues that the ALJ's use of "boilerplate" credibility language warrants remand on the ground that "such language provides no basis to determine what weight the ALJ gave the Plaintiff's testimony." (ECF No. 11 at 6-7). It is well established that "ALJ's have a duty to explain the basis of their credibility determinations, particularly where pain and other nonexertional disabilities are involved." *Long v. United States Dep't of Health and Human Servs.*, No. 88-3651, 1990 WL 64793, at *2 n.5 (4th Cir. May 1, 1990). Social Security Ruling 96-7p instructs that "[w]hen evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individuals statements." SSR 96-7p, 1996 WL 374186, at *4. Moreover, the ALJ's credibility finding "cannot be based on an intangible or intuitive notion about an individual's credibility." *Id.* Rather, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.* Thus, a "bare conclusion that [a claimant's] statements lack credibility because they are inconsistent with 'the above residual functional capacity assessment' does not discharge the duty to explain." *Kotofski v. Astrue*, No. 2010 WL 3655541, 2010 WL 3655541, at *9 (D. Md. Sept. 14, 2010); *see also Stewart v. Astrue*, 2:11-cv-597, 2012 WL 6799723, at *15 n.15 (E.D.Va. Dec. 20, 2012). To the contrary, the

26

decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *4. Here, the ALJ admittedly used "boilerplate" language in finding that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." (Tr. at 39). However, the ALJ did not stop his analysis with only that bare conclusion. He went on to discuss and contrast Claimant's testimony with his prior statements and the medical records, pointing out specific inconsistencies that negatively impacted Claimant's credibility. (Tr. at 40). Accordingly, the ALJ's rationale for discounting Claimant's credibility was sufficiently articulated. This Court is not charged with reweighing the evidence, resolving contradictions in the record, or replacing its credibility assessment with that of the ALJ. Instead, the Court reviews the ALJ's assessment in light of the statements, testimony, objective medical findings and other evidence in the record to determine whether the findings are supported by substantial evidence. In this case, substantial evidence does exist in the record to support the ALJ's credibility finding.

### C. Substantive Effect of Supplemental Medical Records

In addition to arguing the impact of the supplemental records on the ALJ's credibility analysis, Claimant contends that the Commissioner's decision should be reversed or remanded because the outcome of the administrative hearing "might reasonably have been different" if the supplemental records had been available to the ALJ. The Court does not find this argument persuasive.

The Appeals Council accepted and incorporated medical documentation supplied by Claimant after the administrative hearing, including records from St. Mary's Medical Center, Prestera, and University Orthopaedics. (Tr. at 612-784). The hospital records documented treatment received by Claimant for (1) contact dermatitis three years before the disability onset date, (Tr. at 612-19); (2) cellulitis of the face over two years before the alleged disability onset, (Tr. at 620-29); (3) shortness of breath two years before disability onset, which terminated when Claimant left the ED before being seen by a physician, (Tr. 630-32); (4) a foreign body in Claimant's eye, (Tr. at 633-40); (5) a wrist wound, without complications, for which Claimant received no treatment, (Tr. at 641-44); (6) another episode of contact dermatitis, (Tr. at 677-84); (7) assorted blood work, (Tr. at 685-88); dizziness and facial numbness thought to be related to his antipsychotic medication, (Tr. at 689-715); (8) abdominal pain, (716-732); and (9) back spasms, (Tr. at 758-67). None of these records was especially informative as to Claimant's alleged disability. Additionally, the most pertinent materials in the "new" hospital records were duplicative notations regarding Claimant's suicide attempt one year prior to disability onset, (Tr. at 645-60), and his two visits approximately one week later for an elevated blood alcohol level of 364 and depression, (Tr. 661-76). This information was considered by the ALJ when reaching his determination.

The supplemental Prestera records included only one additional counseling note prepared during the relevant time frame; that being, November 10, 2010 through the ALJ's May 18, 2012 decision. That note confirmed that Claimant continued to have depression, but was adjusting to a medication change with some relief of symptoms. (Tr. at 736). The remaining Prestera records, beginning one week after the ALJ's denial of benefits, indicate an abrupt increase in psychological distress brought on by "recent stressors," including the

denial of benefits, the admission of Claimant's mother into the dementia ward of a nursing home, his ex-wife's remarriage, the death of his dog, and a lack of privacy occasioned by his girlfriend's son and grandchildren moving into Claimant's apartment. (Tr. at 737-38). Beginning On June 27, 2012, Claimant reported that he avoided leaving his home, had panic attacks, and no longer took regular walks. The therapist observed objective behaviors indicative of anxiety including shaking legs and feet, trembling lips, and tight posture. (Tr. at 739). Claimant conceded that the increase in his symptoms was likely related to the denial of his disability claims. (Tr. at 740). A letter written by Claimant's therapist described his symptoms during the seven months that she had counseled with him, and commented on the change in Claimant's psychological condition since the denial of benefits, stating "[Claimant] has evidenced symptoms of higher anxiety at last several visits with pressured speech, trembling, and difficulty breathing."  (Tr. at 768).

The University Orthopaedics records document Claimant's surgery for wrist pain and carpal tunnel syndrome, reflecting that the procedure went well and Claimant's recuperation was progressing as expected. (Tr. at 770-84). These records include documentation of Claimant's pulmonology consultation and the contemporaneous recommendation for oxygen.

The Court considered whether the ALJ's action, findings, or determination was contrary to the weight of the evidence when taking into account the record before the ALJ and the supplemental documentation, to the extent that it related to the time period on or before May 18, 2012. Even with the new records, the Court finds that the Appeals Council correctly concluded that the ALJ's decision was not contrary to the weight of the evidence. Rather, the decision was supported by substantial evidence. First, the supplemental hospital records were inconsequential to the disability determination. Second, while the

Prestera records beginning on May 25, 2012 demonstrated a decrease in Claimant's mental functioning, the notations identify specific stressors as the source of Claimant's decline, which were not present during the relevant time frame. Third, although the pulmonology records substantiate a physician opinion that Claimant needed auxiliary oxygen at and around the time of his wrist surgery, the remaining medical records demonstrate that Claimant did quite well without continuous oxygen. Hospital records prepared after Claimant's surgery document that he had no respiratory complaints and had normal oxygen saturation levels in the absence of supplemental oxygen. Similarly, there is no mention of Claimant using oxygen at any of his physician or therapist visits. Finally, the ALJ accounted for Claimant's impairments, including his pulmonary and psychiatric limitations in his RFC assessment, finding Claimant capable of less than a full range of light work with significant restrictions on his exposure to pulmonary irritants, social interaction, and workplace changes, all of which were consistent with the evidence as a whole and the opinions of agency experts. Other than the opinions of agency experts, the record contained no medical source statements assessing Claimant's ability to perform work-related activities. Likewise, no medical source statements suggested in any manner that Claimant was mentally or physically unable to work.

### D.    Subsequent Award of Benefits

Claimant argues in his reply memorandum that remand is necessitated by the subsequent award of benefits, which commenced one day after the ALJ's denial of his applications in this case. Claimant points to opinions in this District that have held that an award of social security benefits based on a second application, which has a disability onset date of one day after the denial of claimant's first application, constitutes new and material evidence warranting remand as to the first application. *Bradley v. Barnhart,* 463

F.Supp.2d 577 (S.D.W.Va. 2006) (citing *Reichard v. Barnhart,* 285 F.Supp.2d 728 (S.D.W.Va. 2003). Notwithstanding the cases cited by Claimant, more recent opinions in this District and in other District Courts in this Circuit have held to the contrary.

For example, in *Sayre v. Astrue,* Case No. 3:09-cv-1061, 2010 WL 4919492, at *4 (S.D.W.Va. Nov. 29, 2010), the District Court found persuasive a decision issued by the United States Court of Appeals for the Sixth Circuit that explicitly rejected the conclusion in *Bradley* and *Reichard* that an award of benefits on a second application, which commenced at or near the time of a decision denying benefits on a first application, was by itself, new and material evidence. *Id.* (citing *Allen v. Comm'r of Soc. Sec.,* 561 F.3d 646 (6th Cir.2009)). The District Court agreed with the reasoning in *Allen,* finding that a decision awarding benefits, "separated from any new substantive evidence supporting the decision," was not "new and material" evidence. *Id.* (quoting *Allen v. Comm'r of Soc. Sec.,* 561 F.3d 646 (6th Cir.2009)). The Court explained that the second decision, apart from any supporting materials, did not meet the prerequisites of sentence six because "the only way that it might change the outcome of the initial proceeding is by the power of its alternative analysis of the same evidence." *Id.* (quoting *Allen,* 561 F.3d at 653). Since a sentence six remand should not address the correctness of the initial decision, remanding that decision based solely on the existence of a subsequent award would be contrary to the intent of the statute. *Sayre,* 2010 WL 4919492 ("Permitting a claimant to obtain a remand in a similar case" would be "tantamount to [sanctioning] a collateral attack on the initial decision" and "would run counter to the need for finality and consistency between SSA disability determinations.").

However, while a decision awarding benefits, alone, is not grounds for a sentence six remand, new substantive evidence supporting the decision might constitute "new and

material" evidence necessitating remand. The underlying evidence, not the award, will determine the propriety of a remand. *See, also, Lewis v. Astrue,* -- F.Supp.2d--, 2013 WL 1337165, at \*15 (S.D.W.Va. Mar. 29, 2013); *Howard v. Comm'r, Soc. Sec. Adm.,* Case No. SAG-10-3175, 2013 WL 588999, at \*3 (D.Md. Feb. 13, 2013) (adopting the rationale in *Allen); Phillips v. Astrue,* Case No. 7:12-cv-194, 2013 WL 485949 (W.D.Va. Feb. 5, 2013) (Notice of Award is not new and material evidence justifying remand); *Atkinson v. Astrue,* Case No. 5:10-cv-298-FL, 2011 WL 3664346 (E.D.N.C. July 20, 2011) (collecting cases).

Although the United States Court of Appeals for the Fourth Circuit has yet to publish a case addressing this precise issue, it recently indicated in an unpublished opinion that it finds the reasoning of the *Allen* court to be sound. *See Baker v. Comm'r of Soc. Sec.,* 520 Fed.App'x 228 (4th Cir. 2013). In *Baker,* the Fourth Circuit stated:

> We reject Baker's claim that she is entitled to a sentence six remand on the basis of a subsequent administrative decision awarding benefits. *See* 42 U.S.C. § 405(g) (2006). The subsequent decision pertains to an application for benefits filed by Baker after the date of the unfavorable decision that is the subject of this appeal. "[A] subsequent favorable decision itself, as opposed to the evidence supporting the subsequent decision, does not constitute new and material evidence under § 405(g)." *Allen v. Commissioner,* 561 F.3d 646, 653 (6th Cir.2009). Baker has not met her burden of showing that evidence relied upon in reaching the favorable decision pertains to the period under consideration in this appeal. We conclude that the evidence is not material to the earlier, unfavorable decision.

*Id.* at 229 fn. 1. Here, as in *Baker*, Claimant failed to supply the Court with new and material evidence justifying remand and failed to make "at least a general showing of the nature of the new evidence." *Miller,* 64 Fed.Appx. at 859-60. As a result, the Court has no way of knowing the reason for the subsequent award. Certainly, the Prestera notes suggest a deterioration of Claimant's condition shortly after the ALJ's denial of benefits, which may explain the different outcome. On the other hand, Claimant may have provided additional records with the second application that related, at least in part, to the relevant

time frame and strengthened his claim of disability. Either way, it is merely speculation. To have merited remand of the ALJ's decision based upon the subsequent award of benefits, Claimant must have produced the new and material evidence used to support the favorable decision and must have established that this evidence pertained to the period under consideration in this appeal. Claimant simply has not met that burden. Therefore, he is not entitled to a sentence six remand.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  October 24, 2013.

Cheryl A. Eifert
United States Magistrate Judge